**SAMOA DEVELOPMENT, INC., Plaintiff,**

**v.**

**AMERICAN SAMOA POWER AUTHORITY,
FRED PELE, and DOES I-XX, Defendants.**

High Court of American Samoa
Trial Division

CA No. 146-95

August 24, 2001

Before RICHMOND, Associate Justice, and LOGOAI, Chief Judge.[1]

Counsel: For Plaintiff, Charles V. Ala`ilima
For Defendants, Roy J.D. Hall, Jr.

## OPINION AND ORDER

Plaintiff Samoa Development Inc. ("Samoa Development") brings this suit for damages against defendants American Samoa Power Authority ("ASPA") and Fred Pele ("Pele") for wrongfully cancelling an award of procurement. ASPA and Pele contend their act was justified by the explicit terms governing the award, specifically those applicable to contractors' bonds. The case proceeded to trial on November 28, 2000. Both counsel were present.

### Facts

On June 8, 1995, the Office of Procurement of the American Samoa Government issued an Invitation for Bids for Project #AS-NH-001(29), regarding striping, signing and delineation of portions of the Territorial Route 1 highway of American Samoa ("the striping project"). ASPA was, at the time, engaged in public highway construction and maintenance. ASPA's Executive Director Abe Malae ("Malae") was, as ASPA's chief procurement officer, ultimately responsible for the selection of outside contractors procured for highway projects. Pele, the

---

[1] Former Chief Associate Judge Tuaolo M.E. Fruean sat at the trial of this case, but resigned from the bench to take his seat in the Senate of the Legislature of American Samoa before the court completed deliberations and issued this decision.

general manager of ASPA's Civil/Highway Division, had been delegated authority for administration of the performance of contracts for such projects, including the contract in question. He also had at least apparent authority to conduct the procurement process for the striping project.

The specifications governing the striping project, made available to all bidders, incorporated the Hawaii Standard Specifications for Road and Bridge Construction and explicitly substituted terms. HAW. DEP'T OF TRANSP., HIGHWAYS DIV., HAW. STANDARD SPECIFICATIONS. Three provisions, in particular, are relevant in this case. Section 103.04 of the specifications governs cancellation of the award, and reserves for the ASG's Department of Public Works "the right to cancel the award of any contract at *any time before the execution of said contract* by all parties without any liability to the awarded and to any other bidder." *Id. at* § 103.04 (emphasis added). Section 103.06 requires contractor's bonds. It states, specifically, "[a]t the time of the execution of the contract, the successful bidder shall file a 'Performance Bond' and a 'Payment Bond.'" *Id. at* § 103.06. Finally, Section 103.08 provides that failure to execute the contract and file acceptable bonds within 10 days after the award of the contract, or within such further time as the Director may allow, shall be cause for the cancellation of the award." *Id. at* § 103.08. Such specifications are authorized by A.S.C.A. § 15.0102 (12).[2]

On July 11, 1995, the Source Evaluation Board ("SEB") for this procurement met, opened the bids, and found Samoa Development to be, at $182,951.00, the lowest responsive bidder.[3] In second place was Island Builders, Inc. ("Island Builders"), at $193,034.69. The U.S. Department of Transportation, Federal Highway Administration ("FHWA"), which provided funding for the striping project, was notified of the SEB's findings by ASPA's letter of July 21, 1995, signed by Pele. FHWA concurred in the award to Samoa Development on August 1, 1995. A notice of award was issued to Samoa Development on August 9, 1995, in a letter from ASPA, signed by Malae and Pele, and addressed to Samoa Development's president Falema`o Pili ("Pili"). The letter requests that Samoa Development "provide originals of the Performance

---

[2] A.S.C.A. § 15.0102(12) enables ASPA to:
> [C]ontract for the procurement of supplies, equipment, materials, personal services other than by employees, and construction with any public or private entity upon terms and conditions as it finds necessary to the full and convenient exercise of its purposes and powers, subject to all applicable laws and rules of American Samoa.

[3] Implicitly at least, the SEB must also have found that all three bidders were responsible and reasonable, as well as responsive, as required by A.S.C.A. § 12.0211(g).

Bond for 100% of the contract amount, Labor and Material Payment Bond for 100% of the contract amount and proof of insurance coverage" within 14 days upon receipt of the notice. The notice was marked received on August 11, 1995.

On August 23, 1995, two days before the deadline to acquire the bonds, Samoa Development sent a letter, signed by Pili, to ASPA acknowledging the "conditional awarding" of the striping contract to it, and asking for an extension of 15 days to acquire the bonds. ASPA granted to Samoa Development an extension within which to provide performance and payment bonds. There is, however, no express evidence as to the actual number of days given in the extension itself, ASPA's notice to Samoa Development of its withdrawal of the striping project award, dated September 13, 1995, signed by Pele for Malae and ASPA, confirms an extension of 19 days. The relevant portion states, "You have been extended nineteen (19) more calendar days, in addition to the addition to the original fourteen (14) calendar days to post the bonds but to no avail." However, a ASPA's later letter of October 6, 1995, again signed by Pele for Malae and ASPA, written with the purpose of asking Samoa Development to pick up the original bonds, states: "It is very unfortunate that your company had failed to submit all necessary bonds in time even after extending the period for further [sic] 14 days. ASPA has been awaiting [sic] 5 days more than the deadline to inform you the withdrawal [sic] of this project."

We find that an extension of 14 days was given. However, we also find that ASPA and Pele unofficially postponed termination of the contract award for another five days and thus afforded Samoa Development further time to provide the required bonds. This action was consistent with ASPA's customary practice. In 1995, ASPA was flexible in its deadlines regarding the accepting and filing of bonds as a matter of practical necessity in the procurement of local contractors to perform public construction projects that required bonding. As small businesses, local contracting firms were unaccustomed to bonding requirements for federally-funded projects and often encountered financial and logistical problems in routinely acquiring contractors' bonds.

Samoa Development did, in good faith, acquire the appropriate bonds. On September 8, 1995, ASPA received from Kalilimoku Hunt, a general agent of the American National Insurance Co., a letter stating that "all of the requirements to consummate the bond" for the striping project were received by the Hunt/Linden Agency, and were then submitted to the National Casualty Insurance Co. It further stated: "[w]e have indications from the Insurance Company that the bond should be issued by Wednesday 13, 1995 [sic]." Samoa Development received further confirmation of the processing of its bond on September 11, 1995, in a

letter from Robert Style, Regional Director of Broker's Network, stating, "we are in the process of procuring bond(s) in the amount $182,951.00."

On September 12, 1995, Samoa Development received a hand-scrawled fax from an "Anita" at Specialty Bonds and Insurance, Co. to a "Kauli," with the subject line "Re: Samoa Development," the body of which states:

> WE HAVE APPROVAL TO ISSUE BOND FOR CAPTIONED. PLZ [sic] HAVE 61A EXECUTED AND FAX'D [sic] BACK. RATE WILL BE 390, SO WE WILL NEED FAX'D [sic] COPY OF CHECK IN AMOUNT OF $5,489.00. THX! [sic].

Samoa Development apprised Pele of the authorization that day, and on September 13, 1995, sent to ASPA what Pili described in a cover letter to be "the documents which indicates [sic] the issuing of our Bond. The Underwriter is sending our Bond in the overnight pouch on Friday's flight."

Despite these communications, in a letter dated and faxed on September 13, 1995, signed by Pele only, without a signature above the signature line for Malae, ASPA withdrew the contract from Samoa Development "because of failure to post the required performance and the payment bonds." Pili immediately responded with a letter asking for reconsideration "on the grounds that a letter of intent was included to ensure the forthcoming issuance of the Bond. Moreover, the fax included from the underwriter further firms [sic] the Impending Bond which was about to be issued."

On September 14, 1995, a letter from Anita Love of Specialty Bonds and Insurance, Inc., was faxed to ASPA confirming that approval had been given to issue performance and payment bonds in the amount of $182,951.00 for the striping project. She also faxed a copy of the bonds to ASPA, and on September 15, 1995, mailed the originals via express mail. These arrived in due course, as confirmed by ASPA's letter of October 6, 1995, signed by Pale for Malae and ASPA, requesting that Pili pick up the originals of the bonds.

Island Builders, the second lowest bidder, was awarded the contract, which was eventually executed without the original payment bond or insurance documentation. It had secured a bond from surety United Pacific Insurance Company on September 1, 1995, according to the dates on the face of the bond. The contract date is listed as August 28, 1995. However, Island Builders still had not supplied either the original payment bond or insurance documentation when ASPA held a

preconstruction meeting on October 17, 1995. Further, due to lack of appropriate equipment, Island Builders caused delay of the striping until at least December 1, 1995.

## Discussion

## I. Termination of the Contract Award

■ Samoa Development complains that it was wronged by ASPA's and Pele's termination of the award of the striping project. However, courts have upheld the right to rescind a contract award where no contractual rights have vested. *McRae v. Farguhar & Aibright Co.*, 269 S.W. 375, 377 (Ark. 1925). The issue is thus whether or not contractual rights vested in ASPA's award of the striping project to Samoa Development.

■ A public agency's invitation for bids is regarded as a request for offers; no contractual rights arise prior to its acceptance by the agency. *State v. Johnson*, 779 P.2d 778, 780 (Alaska 1989). The bid is the offer, and a contract comes into being upon acceptance by the agency. *Id.* However, in this particular case, there are two provisions in the bidding specifications which would function, if the facts are compliant, to restrain the vesting of contractual rights until after an award has been made. These provisions are examined below in light of their interpretation by common law, and application to the relevant facts of this case.

## A. The Cancellation Clause

Section 103.04 of the specifications provides that ASPA, in awarding a bid, maintains "the right to cancel the award of any contract at any time before the execution of said contract . . . without any liability to the awardee." ASPA and Pele contend that because no contract was executed, this provision shields them from liability for terminating the award to Samoa Development.

■ Courts will respect statutory language requiring formal execution of a contract in order for contract rights and obligations to vest. *McRae*, 269 S.W. at 382; *see generally* Annotation, *Revocation, Prior to Execution of Formal Written Contract, of Vote or Decision of Public Body Awarding Contract to Bidder*, 3 A.L.R.3d 864 (1965); 64 AM. JUR. 2D *Public Works and Contracts* §§ 63-81 (1972). Such language manifests parties' intentions to treat a procurement award as a purely preliminary and tentative negotiation event, subject to the signing of a formal contract. *Id.* To do otherwise would be to presume an intention by parties to form a contract prior to formal execution in clear contradiction to open, known, statutory terms. *Id.*

■ Clearly, no formal contract had been executed by September 13, 1995, when ASPA terminated the award, and so it would seem that ASPA has avoided liability. However, where arbitrary action or fraudulent intent to injure a complaining party is indicated, courts may interfere with an agency's power to reconsider and rescind its award. *Schull Constr. Co. v. Bd. Regents of Ed.*, 113 N.W.2d 663, 665 (S.D. 1962).

There is evidence here of arbitrariness in ASPA's action, coupled with an intent to injure Samoa Development, either of which causes us pause in allowing ASPA's exercise of rescission power. Specifically, backroom negotiations appear to have occurred between Pele and Island Builders, the second-lowest bidder which was awarded the contract after Samoa Development's award was rescinded. The bond procured by Island Builders lists September 1, 1995, as the bond execution date, and August 28, 1995, as the contract date, despite the fact that Samoa Development's award was not rescinded until September 13, 1995.

■ Further, it appears that ASPA and Pele arbitrarily terminated the award for Samoa Development. Pele cancelled Samoa Development's contract despite knowing that the bonds had been approved and were about to be issued. Pele then formalized the contract with Island Builders on October 5, 1995, despite its inability to obtain proper striping equipment until December 1, 1995, and more importantly, despite its having neglected to submit an original payment bond or any insurance documentation. We will not honor a clause shielding a government agency from liability that is employed arbitrarily, as a loophole for discrimination against particular private contractors. ASPA may not protect itself from liability due to the cancellation clause in this case. While ASPA may have been within its strict rights to cancel the award to Samoa Development, it did so arbitrarily and is answerable in consequential damages.

B. The Bond Requirement

ASPA further argues that Samoa Development failed to fulfill the bond requirement contained in the bid specifications, and thus provided good cause for ASPA's termination of its award. The requirement for filing bonds is imposed upon Samoa Development by Sections 103.06 and 103.08 of the specifications. HAW. DEP'T OF TRANSP., HIGHWAYS DIV., HAW. STANDARD SPECIFICATIONS §§ 103.06, 103.08. Section 103.06 mandates that the successful bidder file a performance and payment bond "*[a]t the time of the execution of* the *contract.*" *Id.* (emphasis added). Section 103.08 sets an explicit deadline for these conjoint acts, namely "within 10 days after the award of the contract, or within such further time as the Director may allow." *Id.* The penalty for failure to execute

the contract and file acceptable bonds is that such failure "shall be cause for cancellation of the award." Read together, these two sections impose upon the parties the requirement of (1) bond filing simultaneous with execution of the contract, and (2) a deadline for doing so of either 10 days after the award, or within a time specified by the Director of ASPA. After stating an initial 14-day time period in which Samoa Development was to file the bonds, ASPA granted an extension for bond filing, but did not clearly specify how long it would be. By the time ASPA terminated its award, on September 13, 1995, it had received, specifically: (1) a September 8, 1995, letter from the insurance company confirming Samoa Development's submission of bond requirements, (2) a September 11, 1995, letter from Broker's Network confirming that the bonds were being processed, and finally, (3) a fax from Specialty Bonds Insurance Co. indicating approval to issue the bond, and asking for a copy of a $5,489.00 check.

■ It appears, however, that ASPA had an unwritten customary policy of flexibility in accepting contractors' bonds for public contracts where such bonds are proven to be reasonably forthcoming. This appears to be due to the difficulties and time-lags inherent in acquiring such bonds from acceptable off-island sureties when local contractors were still not readily able to obtain bonds. We find it necessary to consider such a custom in this particular, peculiar case, where no written or otherwise obvious manifestation of ASPA's and Pele's intent regarding the timeline for bond filing has been presented beyond Samoa Development's request for a 15-day extension, and ASPA's retroactive, contradictory statements of either 14 or 19 days. *See generally* 21 AM. JUR. 2D *Customs and Usages* (1998).

■ ASPA's custom in 1995 was to be flexible in accepting contractors' bonds for public contracts, so long as they were reasonably forthcoming. Indeed, ASPA eventually executed a contract with Island Builders without the required original payment bond. Samoa Development's bonds were more than forthcoming; they were imminent, predicated only upon the surety's receipt of a check from Samoa Development, and filed the very day after ASPA's arbitrary cancellation of its award.[4] ASPA

---

[4] Copies of the bonds would have been binding between the surety and contractor. Courts must give effect to a contractor's bond of the ordinary type as a simple contract expressing the intention of the parties. *Hosp. for Women of Md. v. U.S. Fid. and Guar. Co.*, 11 A.2d 457, 459 (Md. 1940) (superseded by statute on another matter as stated in *Atl. Sea-Con., Ltd. v. Robert Darin Co.*, 560 A.2d 592, 597 (Md. Ct. App. 1987). Where the objective language used by the parties indicates their intent to be bound by the contract, or by the bond in this case, we will give that language effect. *See, e.g., Record Club of Am., Inc. v. United Artist*

and Pele had been notified, and were fully aware of this fact. Indeed, on September 14, 1995, the day after termination of the contract award, ASPA received a confirmation letter from the surety along with faxed copies of the completed, executed bonds. Had Pele acted for ASPA in a manner less arbitrarily disposed towards Island Builders and more in line with industry custom, he would have received the bonds from Samoa Development and proceeded with execution of the contract with it. We hold that Samoa Development fulfilled the specified requirements for filing bonds, and that ASPA terminated the contract award without good cause.

## II. Damages

### A. Reliance Damages

Samoa Development presented evidence of special damages of $95,288, covering $88,299 as estimated lost profits expected from execution of the bid-upon contract with ASPA, and $6,989 in expenses related to obtaining the contractor's bonds. The issue is whether Samoa Development is entitled to these damages.

■ We have ruled that ASPA and Pele cannot escape liability for arbitrary cancellation of a contract award through the cancellation clause contained in the specifications. This does not, however, mean that a contract was indeed formed, and was indeed breached. As we discussed above, no formal contract had been executed by September 13, 1995, when ASPA terminated the contract award; since such formalization was required by the specifications, no contractual rights and obligations actually vested. We cannot, therefore, award expectation damages, i.e., the estimated lost profits, as would be appropriate in cases involving an actual loss from an actual breach of an actual contract. RESTATEMENT OF CONTRACTS 2d § 347, cmt. a (1981); *Miller v. Robertson*, 266 U.S. 243, *258 (1924)*. *Samoa Development is thus not entitled to the $88,299 in lost profits.*

■ We can, however, award Samoa Development reliance damages to avoid injustice in this case, based on the doctrine of promissory estoppel. This doctrine estops ASPA from denying its implied promise to execute a contract with Samoa Development, once Samoa Development has relied in good faith upon ASPA's representation. RESTATEMENT OF CONTRACTS 2d § 90 (1981). The confirmed expenditures by Samoa Development, made in reliance upon ASPA's promise, are the $5,489 spent on premiums for the contractor's bonds

---

*Records, Inc.*, 890 F.2d 1264 (2d Cir. 1989); *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274 (2d Cir. 1989).

181

and the $1,500 expended on accounting fees and communications related to acquisition of the bonds. We thus award $6,989 as damages related to the cost of the contractor's bonds, expended in reliance upon ASPA's implied promise to execute a contract for the striping project.

## B. Punitive Damages

We have awarded punitive damages to punish defendants and to deter others from committing similar wrongs where we have found that the elements of fraud, malice, gross negligence, or oppression mingle in the controversy. *Fiaui v. Faumuina*, 27 A.S.R.2d 36, 42 (Trial Div. 1994); *Letuli v. Le`i*, 22 A.S.R.2d 77, 85-86 (Land & Titles Div. 1992).

■ To deter ASPA and Pele from wantonly, arbitrarily, and abusively wielding its public procurement power in the future, we award Samoa Development punitive damages of $5,000.00.

## C. Attorney's Fees

■ The general rule is against recovery of attorney's fees by a party which incurs them in enforcing a claim against another. *Interocean Ships v. Samoa Gases*, 26 A.S.R.2d 28, 41 (Trial Div. 1994). We have, however, awarded attorney's fees where required by statute, or where an opposing party has acted wantonly, oppressively, or in bad faith. *Fiaui*, 27 A.S.R.2d at 42; *Samoa v. Gibbens*, 3 A.S.R.2d 121, 123 (Trial Div. 1986).

■ ASPA and Pele acted arbitrarily and in bad faith. Their rescission in spite of Samoa Development's efforts to procure contractor's bonds, of which efforts they were made fully aware, was against courtesy and custom. We thereby award Samoa Development $1,500 in attorney's fees.

### Order

ASPA and Pele are jointly and severally liable to Samoa Development for:

1. $6,989 in reliance damages,
2. $5,000 in punitive damages, and
3. $1,500 in attorney's fees.

ASPA and Pele shall forthwith remit to the Clerk of the Court a total $13,489 for disbursement to Samoa Development.

It is so ordered.